# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| ARIANE ROWLAND, and JAMIE SCHULZE, | ) ) ) Cause No. CV 20-59-BLG-SPW |
| Plaintiffs, | ) ) **ORDER RE MOTION TO COMPEL** ) **HARDIN CONGREGATION'S** ) **SUBPOENA** |
| vs. | ) ) ) |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

This matter comes before the Court on Plaintiffs Ariane Rowland and Jamie

Schulze's Motion to Compel Re: Hardin Congregation of Jehovah's Witnesses

("Hardin Congregation") Subpoena, filed April 21, 2021. (Doc. 48). The Court

granted the Hardin Congregation's Motion to Intervene (Doc. 55) and the Hardin

Congregation filed a response to the Motion to Compel on May 5, 2021 (Doc. 56).

Defendants Watch Tower Bible and Tract Society of Pennsylvania ("WTPA") and

Watchtower Bible and Tract Society of New York, Inc. ("WTNY") joined in the

Hardin Congregation's opposition. (Doc. 58). Plaintiffs filed their reply on May 14,

2021 (Doc. 59) and a hearing was held June 2, 2021. The matter is now deemed ripe for adjudication. For the following reasons, the Court grants Plaintiffs' motion.

## I.     RELEVANT BACKGROUND

At various times between 1973 and 1992, Plaintiffs allege that they endured serial child sexual abuse from members of the Hardin Congregation. Plaintiffs claim that the Defendants permitted and facilitated that sexual abuse, as the two named entities, Watchtower Bible and Tract Society of New York ("WTNY") and Watch Tower Bible and Tract Society of Pennsylvania ("WTPA"), "(1) were operating as alter egos of each other during the period in question; (2) were made aware of the abuse; and (3) chose to allow the abuse to continue by ignoring credible reports and directing congregational leaders in Hardin not to report the abuse to local authorities." (Doc. 49 at 2).

WTPA filed a motion to dismiss Plaintiffs' Complaint for lack of personal jurisdiction, arguing that WTPA does not have the necessary "continuous and systematic" contacts in the state necessary for general personal jurisdiction. WTPA also argues that it does not engage in any substantial interactions in the state that could have resulted in the claimed tort for specific personal jurisdiction. (Doc. 10 at 11).

The Court stayed ruling on the motion to dismiss after reviewing documents submitted by Plaintiffs in response. The Court found that "WTPA may have played

a greater role in the church's governance in the past" (Doc. 24 at 4) and allowed jurisdictional discovery to proceed. Pursuant to that discovery, Plaintiffs served a subpoena duces tecum on the Hardin Congregation on January 11, 2021. The Hardin Congregation produced 100 pages of documents in response but withheld ten documents and heavily redacted two more. The Hardin Congregation stated that these documents were privileged under Montana's statutory attorney-client privilege and statutory clergy-penitent privilege as well as third party privacy, elders expectation of confidentiality, and congregant expectation of confidentiality. (Doc. 49-3).

Plaintiffs filed the present motion to compel arguing that the Hardin Congregation's refusal to provide the withheld documents does not comply with Montana's privilege standards and asks the Court to find that the Hardin Congregation must provide more detail about the documents in order to better determine whether established privileges apply or for the Court to review the documents *in camera* and determine the applicability of the asserted privileges.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 45(e)(2)(A) states:

> A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

Further, District of Montana Local Rule 26.3(c)(2) requires:

> All motions to compel or limit discovery must: (A) set forth the basis for the motion; (B) certify that the parties complied with subsection (c)(1) or a description of the moving party's attempts to comply; and (C) attach, as an exhibit: (i) the full text of the discovery sought; and (ii) the full text of the response.

Subsection (c)(1) requires parties to confer through direct dialogue such as telephone or other detailed communication before a court grants any motion to compel discovery. *See also* Fed. R. Civ. P. 37(a)(3)(B).

In civil cases, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Montana Code Annotated § 26-1-804 provides that "[a] member of the clergy or priest may not, without the consent of the person making the confession, be examined as to any confession made to the individual in the individual's professional character in the course of discipline enjoined by the church to which the individual belongs."

## III. DISCUSSION

As an initial matter, the Court finds that the parties have sufficiently complied with D. Mont. L.R. 26.3(c) as demonstrated by Plaintiffs' Notice of Written Discovery and Associated Conferral Efforts. (Doc. 44). Therefore, the Court shall proceed to address the merits of the Hardin Congregation's privilege arguments.

### a. Hardin Congregation's Additional Privileges

The first issue before the Court is whether the Hardin Congregation's attempts to withhold documents as privileged due to the asserted third-party's, congregants', and elders' expectations of privacy are valid under Montana law. The Hardin Congregation argues that, although these privacy expectations are not codified as privileged under any Montana statute, they nonetheless constitute privileged communications under the Montana Supreme Court's holding in *Nunez v. Watchtower Bible and Tract Society*, 455 P.3d 829 (2018). Plaintiffs oppose this position and argue that the *Nunez* decision concerned an entirely separate statute from Montana's privilege statues and the Montana Supreme Court did not discuss privileges anywhere in the opinion. Therefore, according to Plaintiffs, *Nunez* has no bearing on the scope of Montana's privilege law and did not expand privilege protection to the asserted privacy expectations.

It is a fundamental principle that "the public . . . has a right to every man's evidence." *Trammel v. U.S.*, 445 U.S. 40, 50 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). Courts are afforded the power to craft new evidentiary privileges when necessary, however, the United States Supreme Court has cautioned that courts should not exercise the authority expansively unless it "promotes sufficiently important interests to outweigh the need for probative evidence." *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189 (1990) (quoting *Trammel*, 445 U.S. at 51). Testimonial privileges directly contradict this fundamental principle and, "[a]s such,

they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel*, 445 U.S. at 50. (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960)).

The Hardin Congregation asserts that the Montana Supreme Court, in the *Nunez* case, expanded the scope of the clergy-penitent testimonial privilege to encompass three new privileges: Third-Party Privacy, Elders Expectation of Confidentiality, and Congregant Expectation of Privacy. Specially, the Congregation argues:

> [T]he [*Nunez*] Court took recognized [sic.] that basic tenets specific to the Jehovah's Witnesses' faith put an "emphasis on confidentiality particularly in handling communications and reports of" what the Court described as serious sin. This emphasis on confidentiality expressly applied to: 1) promises to congregants that what they discussed with elders would remain strictly confidential; 2) that the requirement that elders keep such communications strictly confidential was based on Scripture; 3) that congregation members must trust elders to keep all scriptural communications strictly confidential; 4) that the premise the confidential treatment of such communications applied to all members and not just those accused of or confessing serious sin; 5) that an elder's disclosure of confidential communications to those not entitled to hear such communications could call into question an elder's qualifications and result in an elder's removal; 6) that a local elder's communications with experienced elders in New York are likewise strictly confidential; and 7) that all spiritual communications taking place during investigations were strictly confidential.

(Doc. 56 at 5-6). According to the Congregation, these communications are now protected under the umbrella of privilege making the documents described in the Privilege Log appropriately withheld as communications between congregants and clergy and between clergy and clergy.

The Court finds this argument insufficient to warrant the expansion of the testimonial privilege to such an encompassing degree. In *Nunez*, the Montana Supreme Court examined the interplay between Montana's mandatory child abuse reporter statute and the Jehovah's Witness faith's practice of strict confidentiality in handling reports of child abuse within the church. The *Nunez* Court ultimately decided that the reporter statute did not apply to communications made during the Jehovah's Witness congregation's investigation of alleged child sexual abuse based on an exception contained within that statute exempting clergy members from reporting information recognized as confidential under church doctrine. 455 P.3d at 836.

In 1998, Holly McGowan reported to her church elder, Don Herberger, that her stepfather, Maximo Reyes, was sexually abusing her. Jehovah's Witness church doctrine requires two witnesses to substantiate a claim of abuse. *Nunez*, 455 P.3d at 831. Because Holly could not produce a second eyewitness, her claim was dismissed as unactionable and Holly returned home for further, escalating abuse at the hands of Reyes. *Id.*

In 2004, another stepchild of Reyes, Peter McGowan, told Herberger that Reyes had sexually abused him. Holly was able to confirm Peter's report as a second witness and the claim was undertaken by Herberger and two other elders for investigation. *Id.* Neither Herberger nor any other elder ever contacted local authorities regarding the child abuse allegations. Instead, in accordance with church doctrine, Herberger formed a "judicial committee" to confront Reyes and eventually disfellowship him in April 2004. *Id.* A report of the investigation and the disfellowship was compiled and sent to the Christian Congregation of Jehovah's Witnesses, a national church organization that facilitates communications with local chapters and the legal service department housed within Watchtower Bible and Tract Society of New York, Inc. *Id.* A year later, Reyes was allowed to return to the church. *Id.*

During this time, and unknown to the church, Reyes was also sexually abusing his granddaughter, Alexis, beginning in 2002 and continuing for five years. *Id.* Alexis and Holly filed a lawsuit against their local church and Watch Tower in 2016 arguing that the Jehovah's Witnesses were negligent per se under Montana's mandatory reporter statute for failing to report the abuse to local authorities. *Id.*

Codified as Montana Code Annotated 41-3-201(1), the mandatory reporter statute requires select professionals and officials to report child abuse when they "know or have reasonable cause to suspect, as a result of information they receive

in their professional or official capacity, that a child is abused or neglected by anyone[.]" Members of clergy are included in the statute as mandatory reporters. Mont. Code Ann. § 41-3-201(2)(h). However, clergy members are not obligated to report the information "if the communication is required to be confidential by canon law, church doctrine, or established church practice." Mont. Code Ann. § 41-3-201(6)(c).

The *Nunez* Court examined the practice and doctrine of the Jehovah's Witness's church and recognized the heavy emphasis the church placed on confidentiality within its chapters and organizations. *Nunez*, 455 P.3d at 833. Within that doctrine was an established practice to handle reports of child abuse using a committee of local elders and to conduct all investigations internally after contacting Watchtower's legal department for guidance. *Id.* Watchtower informed Herberger, in this case, that Montana law did not require them to report the abuse allegations to local authorities and to continue with the internal investigation. *Id.* Congregants are informed that any communications they have with elders will remain strictly confidential. *Id.* This duty of confidentiality represents a serious undertaking to elders, as "disclosing confidential information constitutes a breach that could result in an elder's removal." *Id.* at 834.

Alexis argued on appeal that, although Jehovah's Witnesses practice confidentiality in communications, Herberger's act of sending Peter's child abuse

report to multiple different individuals and entities within the Jehovah's Witness organization was inconsistent with confidentiality and subjected the report to mandatory reporting. *Id.* The Montana Supreme Court disagreed after examining the express language of the reporting statute and its various exceptions:

> Under § 41-3-201(6)(b), MCA, clergy are not required to report known or suspected child abuse if the knowledge results from a congregation member's confidential communication or confession and if the person making the statement does not consent to disclosure. This exception tracks closely to Alexis's definition of confidentiality—that is, a communication between two people that prohibits disclosure unless the communicant consents. But the Legislature did not so narrowly circumscribe the exception. In adopting § 41-3-201(6)(c), MCA, it indicated its intent to accommodate definitions of confidentiality beyond that contained in subsection (6)(b). When a statute has "several provisions or particulars," courts are, if possible, to adopt a construction that "will give effect to all." Section 1-2-101, MCA. To give effect to both provisions, we conclude that Alexis's restrictive definition of confidentiality is an incomplete construction of the mandatory reporting statute.

*Id.* at 835. Thus, the *Nunez* Court held that because of the Jehovah's Witnesses' documented practice of strict confidentiality, the broader exception of § 41-3-201(6)(c)—exempting church officials from reporting communications "required to be confidential by canon law, church doctrine, or established practice"—applied and the church elders were not required to report the confidential child abuse information to local authorities. *Id.* at 836.

At no point does the *Nunez* Court reference Montana's clergy-penitent privilege statute in their discussion of Jehovah's Witness' confidential practices.

Instead, the analysis is confined solely to the language and application of the mandatory reporter statute. The two statutes are completely dissimilar except for one important instance. Montana's clergy-penitent statute states that "[a] member of the clergy or priest may not, without the consent of the person making the confession, be examined as to any confession made to the individual in the individual's professional character in the course of discipline enjoined by the church to which the individual belongs." Mont. Code Ann. § 26-1-804. Montana's mandatory reporter statute requires clergy persons to report child abuse information unless "the statement was intended to be a part of a confidential communication between the member of the clergy or the priest and a member of the church or congregation[.]" Mont. Code Ann. § 41-3-201(6)(b)(ii).

As noted above, the Montana Supreme Court recognized this (6)(b)(ii) exception to the reporter statute as narrower than the (6)(c) exception resulting in the Court agreeing with the Jehovah's Witness' argument. Had the (6)(b)(ii) exception applied instead of (6)(c), it is unlikely that the *Nunez* Court would have reached the same conclusion as "[the (6)(b)(ii)] exception tracks closely with Alexis's definition of confidential—that is, a communication between two people that prohibits disclosure unless the communicant consents." 455 P.3d at 835. The clergy-penitent privilege statute contains no broad provision or exception similar to (6)(c). The privilege restricts itself to protecting confidential communications made

between a person and a clergy member in the clergy member's professional discipline unless the confessant consents to waiving that protection. Mont. Code Ann. § 26-1-804. This key difference in statutory language convinces the Court that the broad protections the Hardin Congregation seeks are not supported by the privilege statute itself. Simply labeling the communications as confidential does not make them privileged. Confidentiality is just one element required under the privilege statute. To hold otherwise would be to ignore the remaining express language of Mont. Code Ann. § 26-1-804—something the Court does not have the power to do. *See* Mont. Code Ann. § 1-2-101.

Therefore, the Court finds that the Montana Supreme Court's holding in *Nunez v. Watchtower* did not expand Montana's clergy-penitent privilege statute to include the additional privileges urged by the Hardin Congregation. The Court is further not convinced to expand the privilege here and shall apply the statute as strictly construed. *See Univ. of Pa.*, 493 U.S. at 189.

### b. Application of Clergy-Penitent Privilege

Noted above, Montana Code Annotated § 26-1-804 states, "[a] member of the clergy or priest may not, without the consent of the person making the confession, be examined as to any confession made to the individual in the individual's professional character in the course of discipline enjoined by the church to which the individual belongs." The Montana Supreme Court has adopted a broad

interpretation of the statute "in order to minimize the risk that § 26-1-804, MCA, might be discriminatorily applied because of differing judicial perceptions of a given church's practices or religious doctrine, and in order to least interfere with federal and Montana constitutional protections of religious freedom . . . ." *State v. MacKinnon*, 957 P.2d 23, 28 (1998). This interpretation encompasses non-penitential statements as well as strictly confessional statements so long as the non-penitential statements were "made in confidence and for the purpose of seeking or receiving religious guidance, admonishment, or advice. . . ." *Id.*, 957 P.2d at 27-28 (quoting *Scott v. Hammock*, 870 P.2d 947, 956 (Utah 1994). Additionally, for the privilege statute to apply, the confession must be made to a clergy person acting in their professional character, meaning "the clergy persons must be acting in their capacities as clerics or in their religious roles," and must be made in the course of discipline enjoined, meaning "the confession was made pursuant to the practice and discipline of the church." *State v. Gooding*, 989 P.2d 304, 307 (1999) (quoting *MacKinnon*, 957 P.2d at 28).

The Montana Supreme Court undertakes the privilege analysis on a case-by-case basis. In *MacKinnon*, the Montana Supreme Court held that the privilege did not apply to statements made to clergy persons because those statements were not directed at the individuals in their professional characters or made in the course of discipline enjoined by the church. 975 P.2d at 28. MacKinnon had been charged with

sexually assaulting his nine-year-old stepdaughter and became active in the Missoula Christian Church subsequent to the filing of the Information. *Id.* at 24. Two months after the charges were filed, MacKinnon attended a church function at a local restaurant and attempted to discuss the charges with his ex-wife, who was also active in the church, in the parking lot after the function ended. The ex-wife requested that the conversation take place inside the restaurant and in the presence of church officials. *Id.* at 28. The *MacKinnon* Court founds these facts insufficient to demonstrate that MacKinnon's statements were made in confidentiality and for religious guidance:

> MacKinnon, not yet a church member at the time of the July conversation, had not previously sought spiritual advice or counseling from either John or Coleen Contos. Further, MacKinnon did not ask to meet with John and Coleen Contos for the purpose of confession or for religious guidance, counseling, admonishment or advice. Rather, Monica requested that John and Coleen Contos be present during the July conversation, but only to serve as facilitators. Moreover, during the July conversation, MacKinnon did not ask for, and the Contoses did not give, any spiritual advice or forgiveness. No prayers were given and nothing was said about forgiveness. Rather, MacKinnon volunteered his statements without apparent encouragement in order to set things right with his step-daughter, M.G., so that she would not have to testify at court proceedings. In this regard, MacKinnon's statements were directed at Monica and M.G., not the Contoses. Finally, MacKinnon had no reasonable expectation that his statements would be held in confidence. MacKinnon did not seek and the Contoses did not make any representations of confidentiality. Instead, MacKinnon made his statements in a public place to his ex-wife and step-daughter in the presence of the Contoses.

*Id.* at 28-29.

Similarly, in *Gooding*, the defendant, an active member of the Sunrise Church of Christ, was charged with sexual assault of his stepdaughter and attempted to confide his actions in members of his church. 989 P.2d at 305-06. One member, Gerald Glover, was a junior minister in the church while the other member, Tina Glover, did not hold any official church position. *Id.* at 308. The Montana Supreme Court held that despite Gooding's attempts to protect his statements to Gerald as privileged, the district court properly allowed Tina to testify at trial because Tina was present when the statements were made as a layperson by-stander:

> Gooding's statements to Gerald in Tina's presence were not privileged as to Tina, even if we were to conclude that Gerald met the definition of clergy. Section 26-1-804, MCA, states that "a clergy or priest cannot … be examined as to confessions made to him." The statute clearly creates a testimonial privilege for a "clergyman or priest"; the statute does not expressly create a testimonial privilege for a nonclerical church member for statements made in his or her presence. In interpreting a statute, we cannot add what has been omitted. *See* § 1-2-101, MCA.

*Gooding*, 989 P.2d at 308.

The present situation has not been addressed by the Montana Supreme Court. The two prior cases involved direct communications between a single individual and a clergy member or made in front of clergy members. Here, the contested communications are correspondence between Hardin Congregation elders and congregants and individuals in Watchtower New York, New Mexico, and the Christian Congregation of Jehovah's Witnesses. Plaintiffs requested the Hardin

Congregation to produce "[a] copy of all documents in your possession relating to abuse of Ariane Rowland and Jamie Schulze." (Doc. 49-2 at 6). The Hardin Congregation responded "[s]ee attached Privilege Log," (*Id.*) which lists twelve withheld documents. (Doc. 49-3). Those documents include:

1. Internal notes by Hardin congregation elders documenting ecclesiastical communications made in confidence to the elders for the purpose of seeking or receiving religious guidance, admonishment, or advice.
2. Internal notes by Hardin congregation elders documenting ecclesiastical communications made in confidence to the elders for the purpose of seeking or receiving religious guidance, admonishment, or advice.
3. Internal note documenting legal advice received by the Hardin Congregation from Watchtower New York Legal Department.
4. Correspondence from Congregant made in confidence to elders in the Hardin Congregation, for the purpose of seeking or receiving religious guidance, admonishment, or advice.
5. Internal note by Hardin congregation elders documenting ecclesiastical communications made in confidence to the elders for the purpose of seeking or receiving religious guidance, admonishment, or advice.
6. Correspondence from Hardin Congregation made in confidence to Watchtower New York for the purpose of seeking or receiving religious guidance, admonishment, or advice.
7. Correspondence from New Mexico elder to elders in the Hardin Congregation made in confidence to assist the elders in providing religious guidance, admonishment, or advice.
8. Correspondence from the Hardin Congregation to Watchtower New York Legal Department seeking legal advice.
9. Correspondence from the Hardin Congregation to Watchtower New York Legal Department seeking legal advice.
10. Correspondence from Hardin Congregation made in confidence to Christian Congregation of Jehovah's Witnesses for the purpose of seeking or receiving religious guidance, admonishment, or advice.
11. Correspondence from Congregant to Hardin Congregation elders made in confidence to the elders for the purpose of seeking or receiving religious guidance, admonishment, or advice.

12. Correspondence from Congregant made in confidence to elders in the Hardin Congregation, for the purpose of seeking or receiving religious guidance, admonishment, or advice.

*Id.* All but two documents are dated. The Log states that documents 3, 8 and 9 are withheld due to attorney-client privilege.[1] The remaining documents are withheld under several asserted privileges including the clergy-penitent privilege, third-party privacy privilege, elders expectation of confidentiality privilege, and congregant expectation of privacy privilege. *Id.* The Privilege Log contains no information on who specifically created the correspondence, who the correspondence was specifically addressed to, or (with the exception of the three documents claimed to be attorney-client privilege) which specific privilege applies to the document. *Id.* In short, the Privilege Log provides no details regarding the documents other than vague descriptions of the source of the correspondence and its intended audience.

A similar issue appeared before the Court of Appeals of Ohio in *McFarland v. W. Congregation of Jehovah's Witnesses, Lorain, Ohio, Inc.*, 60 N.E. 39 (Ohio Ct. App. 2016). In *McFarland*, the plaintiff sued her local Jehovah's Witness congregation, the Christian Congregation of Jehovah's Witnesses, and Watchtower Bible and Tract Society of New York, Inc. for negligence, ratification, and fraud due to the congregation's alleged failure to protect the plaintiff from molestation at the

---

[1] The documents withheld due to the attorney-client privilege do not appear to be at issue. No party addresses the documents specifically in briefing and Plaintiffs do not make an argument that the attorney-client privilege should not apply.

hands of a member the congregation knew had a history of child sexual abuse. *Id.* at 44. McFarland filed a motion to compel disclosure of several letters and any documents the congregation possessed that related to McFarland and the individual that sexually assaulted her. *Id.* at 45. The defendants opposed the motion on the grounds of clergy-penitent privilege, attorney-client privilege, and the First Amendment. The trial court granted McFarland's motion in part after conducting an *in camera* review and ordered the defendants to turn over 19 documents. *Id.*

On appeal, the Ohio Court of Appeals considered the reach of Ohio's clergy-penitent privilege statute and affirmed the ruling of the trial court as to several of the documents. Similar to Montana's statute, Ohio's clergy-penitent privilege statute reads: "[a] cleric, when the cleric remains accountable to the authority of that cleric's church, denomination, or sect, [shall not testify] concerning a confession made, or any information confidentially communicated, to the cleric for a religious purpose in the cleric's professional character." *Id.* at 46 (quoting R.C. 231702(C)(1)). In affirming the trial court, the court of appeals examined each document individually to determine whether the privilege applied as the privilege "only protects 'information confidentially communicated' when it is communicated to a cleric 'for a religious counseling purpose in the cleric's professional character.'" *Id.* at 47. Thus, "[n]ot every word authored or spoken by a cleric is privileged." *Id.*

The court of appeals found that not every document communicated information intended for a religious purpose. Some were letters from one group of elders to another group of elders and did not appear to respond to any request for religious guidance such as "correspondence between an individual congregation and the [Christian Congregation] Service Department, based on a specific, spiritual inquiry posted by that individual congregation." *Id.* Other documents were letters sent from an individual expressing frustration over the congregation's handling of sexual assault allegations or letters sent from the Service Department containing certain background information to aid investigations of sexual assault. *Id.* at 48-50. These documents were written for secular purposes and not to seek religious guidance or counseling. Thus, the court of appeals held that while the information was confidential, it did not meet the additional requirements to be privileged and the trial court did not err in ordering the production of those documents. *Id.* at 50; *See also Ellis v. U.S.*, 922 F. Supp. 539, 541 (D. Utah 1996) ("[A] subsequent transmittal of a communication may still be confidential if that was intended as a part of the purposes of the communication. A communication to a cleric intended for publication outside the religious uses of the church would not be privileged. In that regard, a communication for an informational, administrative, or public relations purpose would not be confidential.").

The Court finds the practice of the *McFarland* Court instructive and applicable to the present dispute. The difficulty facing the Court is that the Privilege Log contains so few details concerning the documents that the Court is unable to determine whether the communications were made for a religious or secular purpose. As an alternative relief, Plaintiffs have requested the Court perform an *in camera* review of the withheld documents. "Before engaging in *in camera* review . . . 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person' . . . that *in camera* review of the materials may reveal evidence to establish the claim . . . ." *U.S. v. Zolin*, 491 U.S. 554, 572 (1989) (Discussing whether an *in camera* review was applicable to claims that material protected under the attorney-client privilege fell within the crime-fraud exception). This standard also applies to claims of clergy-penitent privilege based on the facts and circumstances of the case. *Ellis*, 922 F. Supp. at 543.

Here, Plaintiffs requested that the Hardin Congregation produce "[a] copy of all documents in your possession relating to abuse of Ariane Rowland and Jamie Schulze." (Doc. 49-2 at 6). In response, the Hardin Congregation attached the Privilege Log describing twelve documents in their possession that the Hardin Congregation was withholding under various claims of privilege. The Court has already discussed the vague nature of the document descriptions, yet the Court finds it telling that these twelve documents were identified in response to Plaintiffs'

question. It is clear to the Court that these documents are related to the abuse allegations of Ariane Rowland and Jamie Schulze, otherwise, the Hardin Congregation would not have mentioned the correspondence at all. While the vague descriptions of the documents prevent the Plaintiffs from making a stronger factual showing, the Court finds that the Plaintiffs have met their burden of demonstrating a reasonable belief that an *in camera* review of these documents produced in relation to the question of Rowland's and Schulze's abuse allegations may yield more evidence establishing those claims. The Court therefore orders the Hardin Congregation to produce unredacted versions of documents 1, 2, 4, 5, 6, 7, 10, 11 and 12 listed in the Privilege Log for the Court's *in camera* review. Documents 3, 8 and 9, withheld due to attorney-client privilege issues, are not at issue in this order and need not be provided.

## IV.  CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiffs Ariane Rowland and Jamie Schulze's Motion to Compel re the Hardin Congregation Subpoena (Doc. 48) is **STAYED** pending the Court's *in camera* review of the documents.

**IT IS FURTHER ORDERED** that the Hardin Congregation must produce an unredacted version of all documents described in the Privilege Log (Doc. 49-3), except documents 3, 8 and 9, for the Court's review within fourteen (14) days of the date of this Order.

The Clerk of Court is directed to notify counsel of the entry of this Order.

DATED this _____8th_____ day of July, 2021.

SUSAN P. WATTERS
United States District Judge