IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ARIANE ROWLAND and JAMIE SCHULZE, | CV 20-59-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., and WATCH TOWER BIBLE AND TRACT SOCIERY OF PENNSYLVANIA, INC. | |
| Defendants. | |

Before the Court is Plaintiffs Ariane Rowland and Jamie Schulze's Motion for Sanctions for Spoliation of Evidence. (Doc. 261). Plaintiffs aver that Defendant Watchtower Bible and Tract Society of New York, Inc. ("WTNY") spoliated documents used by the Service Department to create summaries of the child sex abuse allegations made against Plaintiffs' alleged abusers, Gunnar Hain, Bruce Mapley, Sr., and Martin Svenson. (*Id.* at 1–2). These summaries are referred to as the Memorandums of Record or the Memorandums. As a consequence for WTNY's alleged spoliation, Plaintiffs ask the Court to instruct the jury that: (1) the WTNY Legal Department was under an obligation to maintain and preserve documents pertaining to the sexual abuse at issue in this case and used by the Service Department to create the Memorandums about Hain, Mapley, Sr., and Svenson; (2)

1

those documents were destroyed after the Memorandums were created; and (3) the jury may infer the destroyed documents would have been unfavorable to WTNY. (*Id.* at 2).

WTNY opposes the motion, arguing that it had no duty to preserve the evidence it represented was discarded and that any evidence it had a duty to preserve has either been produced or listed in its privilege log. (Doc. 290).

For the following reasons, the Court grants Plaintiffs' motion.

## I.   Relevant Background

At issue are records that elders in the Service Department used to create the Memorandums about child sexual abuse allegedly perpetuated by Hain, Mapley, Sr., and Svenson.  Plaintiffs first became aware of the Memorandums after the Court ordered WTNY to produce or identify in the privilege log all records in the custody of the Service Department pertaining to child sex abuse.  (Doc. 262; Doc. 187 (Court order); Doc. 262-4 at 30, 31, 33 (WTNY's Fourth Amended Privilege Log)).  The privilege log entries describe the Memorandums as "[i]nternal summar[ies] created by Service Department elders based on correspondence/communications from elders describing accusations of serious sin" involving Hain, Mapley, Sr., and Svenson. (Doc. 262-4 at 30, 31, 33).  Hain's Memorandum, dated October 20, 2016, details: "(a) confessional statements of Gunnar Hain; (b) statements from other parties to the alleged serious sin; (c) response of Service Department elders to elders involved in

2

Montana in the context of ecclesiastical discipline." (*Id.* at 30). Svenson's
Memorandum, dated December 23, 2017, details: (a) statements of denial of Martin
Svenson; (b) statements from other parties to the allege serious sin[s]." (*Id.* at 31).
Mapley, Sr.'s Memorandum, dated November 16, 2019, details: (a) confessional
statements by Mr. Mapley; (b) statements from other parties to the alleged serious
sin; (c) response of Service Department to the Montana elders involved, in the
context of ecclesiastical discipline." (*Id.* at 33). Plaintiffs represent that they had to
demand production of the Memorandums before WTNY produced them. (Doc. 262
at 11).

Upon receiving the Memorandums, Plaintiffs served a request for production
on WTNY asking to "produce all records/documents that formed the factual basis
for the Memorandums of Record referred to in your Fourth Supplemental Privilege
Log Entries 87-93." (Doc. 262-5 at 2). WTNY responded that it "has no way of
determining what specific records and/or documents formed the factual basis for the
documents identified as Privilege Log Nos. 87-93. All documents related to the
documents identified as Privilege Log Nos. 87-93 have either been produced,
identified in the privilege log, or no longer exist." (*Id.*).

Plaintiffs also served an interrogatory on WTNY that read:

For all 'communications/correspondence' in your answer to RFP No.
94-96 that no longer exists, please state the following: (a) identify
whether a paper copy of the document existed, and if so when it was
created and when it was discarded; (b) identify whether a digital copy

3

existed, and if so when it was created and when it was discarded; (c) describe the chain of custody for all paper and digital versions of the document that identifies all Departments and people who possessed the document; (d) whether a litigation hold was ever placed on the document, and if so who issued the hold, when the hold was issued, and when the hold expired; and (e) the document destruction/retention policy that governed the decision to discard the document.

(Doc. 262-6 at 2).

WTNY responded on November 8, 2023, in relevant part:

WTNY is unable to answer this Interrogatory and subparts because it has no way of knowing whether any such documents ever existed. When the Memorandums of Record were created, the elder in the Service Department had the liberty to rely on any then existing religious documents and had the option to call the elders for details contained in the Memorandums. WTNY cannot reverse engineer how the Service Department elder created the Memorandums of Record and therefore would only be guessing what specific records and/or documents formed the factual basis for the Memorandums. Every existing document that could have formed the basis for the Memorandums has either been produced or identified in the privilege log. If there were any other records/documents that formed the factual basis for the Memorandums of Record when they were created, such records/documents were discarded once the memorandums were completed.

(*Id.* at 3).

Plaintiffs also served on WTNY an interrogatory asking, "For each year between 1973 and 1992, please state your procedure and process for receiving correspondence from local congregations regarding child sexual abuse. Please specifically include where such correspondence was received, who received it, what was done with it, and identify everyone who had access to the substance of such correspondence." (Doc. 262-2 at 2) (emphasis in original). WTNY responded on

4

June 14, 2022, describing how congregations could confidentially write to WTNY about matters involving child sex abuse to receive religious advice and that correspondence would be received by elders in the Service Department and maintained in a secure filing cabinet. (*Id.* at 2–3). WTNY filed a supplemental response on October 23, 2023, stating that the correspondence referenced in its first response remained in a secure filing cabinet at the Service Department until the 2000s and then were digitized into PDFs over the next decade. (*Id.* at 3). It explained that only elders in the Service Department had access to the documents until later in the 2010s when, "in response to litigation holds, WTNY's Legal Department took possession of the PDF documents." (*Id.*).  The documents remain in the Legal Department's possession, and only the Legal Department can access them. (*Id.*).

On November 20, 2023, Plaintiffs' counsel sent WTNY's counsel a letter asking for clarification on what litigation holds WTNY was referencing and their scope. (Doc. 290-7 at 5).  WTNY responded on December 7, 2023, that a litigation hold was issued in a state case in the Superior Court of the State of California, County of San Diego, *Lopez v. WTNY*, No. 37-2012-00099849. (Doc. 290-8 at 5). WTNY explained that the litigation hold originally was for case-specific records, "but in 2013 during the course of discovery[,] two document demands expanded the scope of the records needing to be held. The demands included all of the U.S. congregations' responses to the March 14, 1997 letter from WTNY and all records,

communications, and reports relating to child abuse from 1979 to 2013." (*Id.*). WTNY stated that the hold was lifted at the end of the case, but that "WTNY has maintained the responsive documents in the Legal Department because subsequent litigation involving the law firm representing [the perpetrator of the abuse] included demands for the same records." (*Id.*). WTNY then wrote that the discovery demands in *Lopez* "encompass records that have been produced or logged in this lawsuit." (*Id.*).

Plaintiffs filed the instant motion for sanctions on April 3, 2024, arguing that WTNY breached its duty to preserve the documents used to create the Memorandums that it represented were discarded. (Doc. 261).

## II.   Discussion

A district court has the inherent authority to levy sanctions against a party who has despoiled evidence in response to abusive litigation practices. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337–8 (9th Cir. 1985)).   Under this authority, the district court has broad discretion to fashion appropriate sanctions. *Id.* at 961.

The Ninth Circuit has "not set forth a precise standard for determining when spoliation sanctions are appropriate." *Reinert v. Tucker*, CV 16-154-BLG, 2018 WL 2120904, at *2 (D. Mont. May 8, 2018) (internal citation and quotation omitted). The majority of trial courts in the circuit have adopted the following test for the use

of an adverse inference as sanctions for spoliation of evidence: (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) "the records were destroyed with a culpable state of mind"; and (3) "the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 989–90 (N.D. Cal. 2012) (citations and internal quotations and brackets omitted); *see also Leon*, 464 F.3d at 958 (outlining a similar test for determining when to "impos[e] the harsh sanction of dismissal") (internal citation and quotation marks omitted). The party seeking spoliation sanctions bears the burden of establishing each element by the preponderance of the evidence. *Apple*, 888 F. Supp. 2d at 989–90 (burden); *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052–53 (S.D. Cal. 2015) (standard of proof).

### A.    *Control Over the Evidence*

The parties initially disagree on whether WTNY had control over the at-issue evidence, which WTNY contends was in the possession of and discarded by the Service Department and its corporate affiliate, the Christian Congregation of Jehovah's Witnesses ("CCJW"). Plaintiffs maintain WTNY had control over documents relating to child sex abuse used to create the Memorandums that were in the possession of CCJW and the Service Department when the Memorandums were created and the documents discarded. (Doc. 303 at 9). WTNY asserts that, when

7

the Memorandums were created and CCJW and the Service Department discarded the records used to create the Memorandums, WTNY had no obligation to preserve those entities' documents. (Doc. 290 at 9, 11).

The Court agrees with Plaintiffs that WTNY had control over the at-issue records during the relevant time. In the Court's previous Order on Plaintiffs' Motion to Compel Production of All Discoverable Documents and Information at the Jehovah's Witnesses' New York Headquarters, the Court found that "WTNY has control over documents held by CCJW and the Service Department." (Doc. 187 at 7). The Court based its reasoning, in part, on a variety of documents provided by Plaintiffs that circumstantially demonstrated WTNY had such control. (*Id.* at 9–10). The oldest of the documents was dated in 2006, and most of the documents were dated around the time that the two events Plaintiffs posit triggered WTNY's duty to preserve occurred (2011 and 2013). (*Id.*).[1] Accordingly, because the documents that formed the basis of the Court's holding were dated between 2006 and 2021, the Court's determination that WTNY had control over CCJW and the Service Department's records was not cabined to the moment the Court issued the order.

---

[1] Ironically, WTNY attempted to rebut the motion to compel by pointing to the age of the documents and that Plaintiffs' use of them was an attempt to "grossly mislead" the Court into accepting facts that were no longer true. (*See* Doc. 187 at 10). The Court rejected that argument, in part because WTNY provided no evidence to rebut the veracity of the exhibits. Now, those documents are crucial to the Court's determination about the time period over which WTNY had control over CCJW and the Service Department's records.

Rather, the Court's holding also applied to the time period of the documents on which the Court relied. Accordingly, WTNY had control over CCJW and the Service Department's records at least as far back as 2006.

### B.    Obligation to Preserve

Since WTNY had control over CCJW's documents, the next question is whether WTNY had an obligation to preserve the evidence at the time it was destroyed. The Ninth Circuit has not defined when the duty to preserve evidence is triggered. *See Apple*, 888 F. Supp. 2d. at 991. However, "there is no question" that a party's duty to preserve relevant evidence may arise even before litigation is formally initiated. *Id*. at 990. As such, trial courts in this circuit generally agree that the duty to preserve relevant evidence before litigation commences is triggered "'[a]s soon as a potential claim is identified.'" *Id*. at 991 (quoting *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006)). Litigation need not be immediate or certain. *Id*. (citing *Hynix Semiconducter Inc. v. Rambus, Inc.*, 645 F.3d 1336 (Fed. Cir. 2011)). Rather, litigation must be "more than a possibility." *Hynix Semiconducter Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1061 (N.D. Cal. 2006), *vacated on other grounds by* 645 F.3d 1336. "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Apple*, 888 F. Supp. 2d at 990.

Plaintiffs posit two triggers for WTNY's duty to preserve. First is the litigation hold issued in *Lopez*. Plaintiffs argue that *Lopez*'s expanded litigation hold imposed a duty on WTNY as early as 2013 and continuing through today to preserve the at-issue documents it represented were discarded. (Doc. 262 at 16–17). Plaintiffs rely on WTNY's counsel's representation that the litigation hold covered "all records, communications, and reports relating to child abuse from 1979 to 2013." (*Id.* at 6–7 (quoting Doc. 262-1 at 5)). Given the scope of the revised litigation hold, the hold included those records, communications, and reports received between 1979 and 2013 relating to child sexual abuse occurring at the Hardin congregation, according to Plaintiffs. (*Id.* at 7).

WTNY disagrees, arguing that the *Lopez* hold did not extend to those documents controlled by the Service Department and CCJW because the *Lopez* court did not compel WTNY to produce documents directed to CCJW, as this Court did. (Doc. 290 at 6 (citing Doc. 290-9 ¶ 10)). WTNY cites Mario Moreno's affidavit, in which Moreno declares that the litigation hold included "records *sent to WTNY* involving child sexual abuse from 1979 to 2013." (Doc. 290-9 ¶ 8) (emphasis added). Moreno also maintains that the litigation hold did not extend to documents held by CCJW. (*Id.* ¶¶ 9–10). He references a 2017 Minute Order from *Lopez* in which the court held that WTNY was not compelled to produce post-March 2001 documents in the physical possession of CCJW because CCJW "is not a party

10

to this action" and WTNY "does not have possession, custody or control over non-party CCJW's documents and cannot produce them." (Doc. 290-9 at 10–12).

The Court cannot conclude by the preponderance of the evidence that the *Lopez* hold imposed a duty on WTNY in 2013 to preserve the at-issue documents because the record contains no clear statement on the scope of the *Lopez* hold. No party has provided a copy of the order, transcript, or other primary source from the *Lopez* court that established the expanded litigation hold, therefore preventing the Court from assessing its original language. Instead, the Court has the descriptions of the litigation hold's scope from WTNY's counsel's letter and Moreno's affidavit, the former of which describes the litigation hold very broadly, as including, "all records, communications, and reports relating to child abuse from 1979 to 2013," (Doc. 262-1 at 5), and the latter of which limits the hold's scope to "records *sent to WTNY* involving child sexual abuse from 1979 to 2013." (Doc. 290-9 ¶ 8) (emphasis added). The differences between the two statements are material and cannot be reconciled on the record before the Court.

The 2017 minute order in *Lopez* is not dispositive or even persuasive on the issue of the scope of the litigation hold because it was addressing a different issue: "Whether the production of documents (post-March 2001) now in the physical possession of non-party CCJW can be compelled through a discovery request on Watchtower, or must plaintiff subpoena the records directly from CCJW." (Doc.

11

290-9 at 10). Though the minute order indicates how the court thought about the relationship between CCJW and WTNY, it does not speak to the reach, and any limits on the reach, of the litigation hold.

Given the lack of information the Court has about the scope of the *Lopez* hold, the Court cannot find that it imposed a duty on WTNY to preserve the at-issue documents starting in 2013.

Plaintiffs' second proposed trigger for WTNY's duty to preserve is the various reports WTNY's Legal Department received beginning in 2011 from local congregations of threats of legal action related to Hain, Mapley, Sr., and Svenson. (Doc. 262 at 12, 17; Doc. 303 at 5–6). Plaintiffs argue that these reports, the notes from which are listed in WTNY's privilege log, demonstrate that the Legal Department was on specific notice of repeated litigation threats involving child sexual abuse by Hain, Mapley, Sr., and Svenson as early as 2011 and at least before the Memorandums were created (Hain on 10/20/16, Svenson on 12/23/17, and Mapley, Sr. on 11/16/19). (Doc. 262 at 13, 17).

WTNY responds that any calls made before May 6, 2019, when Montana's revival statute was passed, could not have triggered WTNY's duty to preserve because until then, Plaintiffs' claims were time-barred. (Doc. 290 at 14). WTNY cites *Sussman v. Am. Broad. Cos., Inc.*, 971 F. Supp. 432, 435–36 (C.D. Cal. 1997) in support of its position that "the possibility of future litigation is not reasonably

foreseeable when the underlying claims have become time-barred." (*Id.* at 10–11, 14).

On reply, Plaintiffs describe WTNY's position is "untenable" because it would allow "a party threatened with litigation" to "destroy evidence that it knows could be relevant to that litigation by unilaterally determining it has an affirmative defense." (Doc. 303 at 5). "Unproven defenses are not a free pass to destroy evidence that WTNY's Legal Department had a duty to preserve." (*Id.* at 6). As to *Sussman*, Plaintiffs contend it is inapplicable because the party accused of spoliation in *Sussman* did not receive threats of litigation. (*Id.*). "If anything, *Sussman* serves to reinforce that WTNY had a duty to preserve 'evidence needed for prospective litigation' that was made known through repeated and consistent litigation threats." (*Id.*)

As an initial matter, the Court does not agree with WTNY that the fact that Plaintiffs' claims were time-barred before May 6, 2019, absolved it of its duty to preserve. Whether the statute of limitations bars a claim is an affirmative defense that must be proven and adjudicated by a court. *See* Fed. R. Civ. P. 8(c)(1) (requiring a party to affirmatively state the defense of statute of limitations in response to a pleading); Fed. R. Civ. P. 12(b)(6) (allowing a party to move to dismiss for failure to state a claim, which can include when a claim is time-barred); *Sussman*, 971 F.

Supp. at 435 (finding that summary judgment is proper on the plaintiffs' fraud claims because the statute of limitations had run).

Sussman does not stand for the proposition that the duty to preserve evidence is not triggered when a claim is potentially time-barred. In Sussman, the plaintiffs alleged three substantive claims and one claim under state law for spoliation. Id. at 432. The court found summary judgment was proper on the three substantive claims. Id. at 434–35. The court granted summary judgment on two of the claims because they were time-barred. Id. On the spoliation claim, the court held that because summary judgment was proper on each of the substantive claims, any prospective civil litigation to which the spoliation claim could have attached was disposed of. Id. at 435. Accordingly, Sussman supports the notion that a court must adjudicate a claim as time-barred before a party can be relieved of its duty to preserve evidence, rather than a party assuming it has no duty because it believes a claim is time-barred.

Moving to whether the calls starting in 2011 triggered WTNY's duty to preserve the at-issue evidence, the Court finds that they did as to Mapley, Sr. and Svenson. The Court cannot independently assess whether the content of calls would have made a reasonable party in the same circumstances reasonably foresee litigation, since the notes from the calls between the congregations and WTNY's Legal Department are privileged. (See Doc. 329-4 at 2–3). However, WTNY's counsel in this case described them as "litigation threat[s]" in a letter to Plaintiffs'

14

counsel.  (Doc. 262-7 at 4–7).  Certainly, a "threat" of litigation would put a reasonable person in the same situation on notice that litigation was more than possible, particularly given the congregations received and reported to WTNY 11 litigation threats involving Mapley, Sr. and Martin Svenson in 2011 alone.  (*Id.*). Even more, a reasonable person in WTNY's circumstances should have been on particular notice because WTNY had been the target of multiple lawsuits at the time and had formally asked congregations for information about abusers in 1997. Further, if WTNY was able to determine that the threats were time-barred, then it must have been able to identify the potential claim(s) the callers sought to raise. Accordingly, the litigation threats beginning in 2011 about Mapley, Sr. and Svenson triggered WTNY's duty to preserve evidence related to child sex abuse, which extended to CCJW and the Service Department.

As to Hain, WTNY's counsel's letter does not describe any calls pertaining to threatened legal action, only two calls from elders at the Hardin Congregation to WTNY's Legal Department on October 17, 2019 and December 13, 2019, about the elders' "legal obligations" involving Hain's alleged conduct.  (Doc. 262-7 at 7). However, WTNY's counsel describes a letter listed at Privilege Log 41 from the same elders at the Hardin Congregation to WTNY's Legal Department dated May 5, 2011, "seeking legal advice regarding *threatened legal action* in relation to Bruce Mapley, Sr., Gunnar Hain, and Martin Svenson's alleged conduct."  (*Id.* at 13)

(emphasis added). The threat of legal action is sufficient to have triggered WTNY's duty to preserve as to Hain on May 5, 2011.

Plaintiffs also list five records referenced in the Mapley, Sr. Memorandum that Plaintiffs aver WTNY has neither produced nor listed in the privilege log and therefore must have discarded, despite its duty to preserve. (Doc. 262 at 10–11). The Court will address each in turn.

The first is a letter of introduction that "clearly conveyed" the restrictions placed on Mapley, Sr. (*Id.* at 10 (quoting Doc. 263 at 3)). WTNY responds that neither WTNY nor CCJW generate letters of introduction, and therefore the letter "could have been sent to CCJW, or the elder in the Service Department preparing the Mapley Memo may have telephoned the congregations for details and information that was conveyed orally[.]" (Doc. 290 at 7). Thus, according to WTNY, the mention of the letter "does not evidence its existence or non-existence at CCJW." (*Id.*).

Neither party can know where the drafter of the Memorandum got the information about the letter of introduction. As such, the only information the Court has to work off of are the representations provided by WTNY. WTNY's suggestion that the elder obtained the information about the letter of introduction from a source other than a document in their possession contradicts Moreno's representation that the Memorandums were created using various electronically-stored documents.

Moreno states in his affidavit that "the Service Department began, in some cases, to consolidate *multiple pdfs* into one Memorandum of Record to facilitate ease of access to information and to reduce the amount of data it maintained." (Doc. 290-9 ¶ 14) (emphasis added). In describing the general purpose of the Memorandums and procedure in drafting them, Moreno makes no mention of elders calling congregations to supplement the Memorandums. He later suggests that the elder drafting the Mapley, Sr. Memorandum "may have telephoned the congregation for details[,]" but Moreno seems to be guessing as to whether the elder called. (*Id.* ¶ 20). Since his description of the procedure of drafting the Memorandums lacks any reference to elders making phone calls, Moreno's statement that the elder "may have" called the congregation for details is too uncertain for the Court to rely on, particularly in light of his unqualified statements about the Service Department's procedure in drafting the Memorandums, (*Id.* ¶ 14).

The Memorandum also states Mapley moved to a new congregation in 2015, and "his restrictions were clearly conveyed in a letter of introduction." (Doc. 263 at 3). The term "clearly" indicates that the elder drafting the Memorandum reviewed the letter, given the unequivocal nature of the term. Thus, the Court concludes that the elder drafting the Memorandum for Mapley, Sr. had a copy of the letter of introduction and that it was discarded despite WTNY's duty to preserve it.

Second is a reference to a "cry of complaint" that Tracy Caekaert—one of the Plaintiffs in the companion case to this one, CV 20-52-BLG-SPW—raised concerning the alleged abuse by Mapley, Sr. not being reported to the authorities and Mapley, Sr. not being registered as a sex offender. (Doc. 262 at 10). WTNY asserts that "cry of complaint" is a Biblical phrase "found in Genesis 18:20, 21 and Exodus 2:23-25 to describe when a congregant is suffering and seeking assistance." (Doc. 290 at 8 (citing Doc. 290-9 ¶ 21)). Though the Court does not dispute the meaning of "cry of complaint," Caekaert's cry of complaint must have been memorialized in some document for the elder drafting the Memorandum to have learned about it and its contents. As such, WTNY had a duty to preserve the document that memorialized the cry of complaint.

Plaintiffs last cite to three letters from 2004, 2010, and 2019 sent by CCJW to congregations numbered 46052, 46771, and 60087, respectively. (Doc. 262 at 10–11). WTNY maintains that since the letters were sent by CCJW, they were not subject to the litigation hold or maintained in the ordinary course. (Doc. 290 at 8). As the Court has determined that the litigation threats beginning in 2011 triggered WTNY's duty to preserve, and by extension CCJW's duty to preserve, evidence related to Hain, Mapley, Sr., and Svenson, WTNY's duty to preserve extended to those letters.

C.   *Destroyed with a Culpable State of Mind and Relevant to Potential Litigation*[2]

The Court next must decide whether WTNY destroyed the records with a culpable state of mind.  "In the Ninth Circuit, a party may be entitled to an adverse inference instruction based on spoliation even in the absence of a finding of bad faith."  *Apple*, 888 F. Supp. 2d at 998 (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992)).  The Ninth Circuit has instructed that district courts may impose sanctions even against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'" *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993) (quoting *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir. 1991)); *see also Apple*, 888 F. Supp. 2d at 998 ("The Court need only find that [the spoliating party] acted with 'conscious disregard' of its obligations.") (internal citation omitted).  Spoliation of this kind is deemed willful. *See Leon*, 464 F.3d at 959 ("A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were *potentially* relevant to the litigation before they were destroyed.") (internal citation and quotation marks omitted) (emphasis in original).

---

[2] Because a "willful" state of mind requires that the evidence destroyed be potentially relevant to the litigation, like the third element of the test for an adverse inference from *Apple*, the Court will collapse the final two elements of the *Apple* test into the same section.

Plaintiffs contend "WTNY's spoliation was willful because it had notice that the 'correspondence/communications' which were used to create the Memorandums were relevant to the litigation." (Doc. 262 at 18). Plaintiffs maintain that the threats of litigation surrounding Hain, Mapley, Sr., and Svenson put WTNY on notice that those records used to create the Memorandums were relevant to ongoing and threatened litigation. (*Id.*).

WTNY does not address this element directly, so the Court could construe WTNY as conceding the point. To the extent other parts of WTNY's motion addresses this element, WTNY generally asserts that any records relevant to child sexual abuse that were discarded were discarded by CCJW. (Doc. 290 at 13–14). Since WTNY purports to not have access to documents in the custody of CCJW until the Court's ruling and because CCJW was not subject to any litigation hold, any destruction of the documents by CCJW is not WTNY's fault. (*See id.*).

The Court finds WTNY acted willfully. First, as stated, WTNY has had control over the documents in the custody of CCJW and the Service Department since at least 2006. Second, WTNY was receiving notice of threats of litigation with respect to Hain, Mapley, Sr., and Svenson as early as 2011 and through 2019. Those threats should have caused WTNY to preserve all records related to child sexual abuse allegedly perpetrated by Hain, Mapley, Sr., and Svenson that it had control

over—including those in the custody of CCJW. Thus, WTNY allowed CCJW to discard certain documents despite being on notice of potential litigation.

For the spoliation to have been willful, the documents also must have been potentially relevant to the litigation. Neither party is able to identify the specific records, since, according to WTNY, there is no way for it to recreate what records were used to draft the Memorandums. According to Plaintiffs, "based on the contents of the Memorandums"—*i.e.* accusations of child sexual abuse—"it is obvious that the documents used to create them contained relevant evidence." (Doc. 262 at 19). Plaintiffs point out the five documents referenced in the Mapley, Sr. Memorandum and discussed above as examples. (*Id.*). Further, that Plaintiffs cannot know the contents of the records used to create the Memorandums, or if the Memorandums accurately reflect the records, "cannot be used against them in the spoliation analysis." (*Id.* at 20 (citing *Webster v. Psychiatric Med. Care, LLC*, 386 F. Supp. 3d 1358, 1368 (D. Mont. 2019))).

WTNY responds that the records used to create the Memorandums that no longer exist that were in WTNY's custody "may have been" unrelated to child sexual abuse. (Doc. 290 at 7, 13). WTNY maintains that it preserved and either produced or listed in its privilege log the records in WTNY's custody that related to child sexual abuse. (*Id.*). It indicates that the CCJW records may have been relevant to child sexual abuse. (*Id.* at 14 ("CCJW and documents sent to it were not subject to

21

the litigation hold. Documents like these are ones that could have been destroyed/discarded prior to the filing of the instant lawsuit, and such destruction would not have violated any applicable litigation hold.")).

The Court will presume the at-issue records discarded by the Service Department or CCJW contain relevant evidence given the circumstances. As Plaintiffs state, the records were used to create summaries of the allegations of child abuse lodged against Hain, Mapley, Sr., and Svenson. The type of document narrows the categories of records to ones more likely than not to contain information about child sexual abuse. WTNY's only rebuttal is that the documents "may have" contained material unrelated to child sexual abuse. Given WTNY's pattern of providing overly vague, and thus unreliable, descriptions of documents in this case (*see, e.g.,* Docs. 72, 186), the Court agrees with Plaintiffs that the Court should not simply trust WTNY's word that the evidence is not relevant. *See Giacometto Ranch Inc. v. Denbury Onshore LLC*, CV 16-145-BLG, 2024 WL 218625, at *5 (D. Mont. Jan. 4, 2024) ("Where, as here, potentially relevant information has been destroyed, there is a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it.") (internal citation and quotation marks omitted); *Webster,* 386 F. Supp. 3d at 1368 (quoting *Leon,* 464 F.3d at 959) ("[B]ecause 'the relevance of destroyed documents cannot be clearly ascertained [when] the documents no longer exist,' a party 'can hardly

assert any presumption of irrelevance as to the destroyed documents' ... [The defendant] cannot, particularly after engaging in an obstructionist pattern of discovery, ask [the plaintiff] to simply trust in its interpretation of evidence when [the plaintiff] has not been freely able to develop her own theories."). Accordingly, the at-issue records are relevant, and WTNY willfully spoliated the evidence.

### D.   Sanction

Last, the Court must determine the appropriate sanction. Among the available sanctions to a court exercising its inherent discretion are: (1) the exclusion of evidence, including spoiled evidence; (2) the admission of evidence of the circumstances of the destruction or spoliation; or (3) the instruction of the jury that it may infer that the spoiled or destroyed evidence would have been unfavorable to the responsible party. *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1143 (D. Mont. 2009) (citing *Glover*, 6 F.3d at 1329). "A court may also look to Fed. R. Civ. P. 37(b)(2)(A) for guidance as to other alternative sanctions such as directing 'designated facts be taken as established for purposes of the action[.]'" *Id.* (quoting Fed. R. Civ. P. 37(b)(2)(A)).

The choice of an appropriate sanction "must be determined on a case-by-case basis, and should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence and the degree of prejudice suffered by the movant." *Sanders v. Univ. of Idaho, College of Law*, 634 F. Supp. 3d 936, 944 (D. Idaho 2022)

(internal citation and quotation marks omitted).  In selecting an appropriate remedy, a court must choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Apple,* 888 F. Supp. 2d at 992 (internal citation and quotation marks omitted).

The Court finds Plaintiffs were prejudiced by the spoliation.  First, as stated, there is a "presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Id.* at 988.  Further, although the records were summarized in the Memorandums, the Memorandums are "not a substitute for the [records] themselves, which had more complete details" about the events at issue. *Sanders,* 634 F. Supp. 3d at 944.  The preparation of any summary report based on a variety of records "inherently calls for some culling in the drafting and editing process." *Id.*

The Court also finds the degree of fault is moderate, though certainly not bad faith, which could warrant a dispositive sanction.  As stated, WTNY was on notice of potential litigation, yet destroyed the at-issue records.

Given the high degree of prejudice and moderate degree of fault, the Court finds an adverse inference instruction is appropriate.  WTNY does not take issue with the specific language of the proposed jury instructions, and therefore the Court will adopt the jury instructions as written by Plaintiffs.

## III.   Conclusion

For these reasons, Plaintiffs Ariane Rowland and Jamie Schulze's Motion for Sanctions for Spoliation of Evidence (Doc. 261) is GRANTED.   The jury will be given the following instructions at trial:

(1) the WTNY Legal Department was under an obligation to maintain and preserve documents pertaining to the sexual abuse at issue in this case and used by the Service Department to create the Memorandums about Hain, Mapley, Sr., and Svenson;

(2) those documents were destroyed after the Memorandums were created; and

(3) the jury may infer the destroyed documents would have been unfavorable to WTNY.

DATED the _10th_ day of June, 2024.

SUSAN P. WATTERS
UNITED STATES DISTRICT JUDGE